UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


RODNEY C. EPPERSON,

                    Plaintiff,

v.                                        Case No. 3:11-cv-182-J-37MCR

PAGE A. SMITH, M.D., et al.,

                    Defendants.

_____


**ORDER**

**I.  Status**

    Plaintiff, a *pro se* former inmate, is proceeding on an Amended

Complaint (Amended Complaint) (Doc. #28), filed on August 11, 2011,

pursuant to the mailbox rule.[1] Defendant Jorge Delgado, MD's July

9, 2012, Motion for Summary Judgment (Doc. #83), Defendant's, Dr.

Francisca Ledesma's July 20, 2012, Motion for Summary Judgment (Doc.

#85), and the August 3, 2012, Corrected Motion for Summary Judgment

by Defendants Smith, Isra, Gonzalez, Gaxiola, Willis, Davis, and

Tucker (Corrected Motion) (Doc. #92) are pending before the Court.

Although Defendant Buss is not mentioned in the title of the

Corrected Motion, he is listed as one of the Defendants in the body

_____

    [1] The original Complaint (Doc. #1) was filed on February 23,
2011, pursuant to the mailbox rule.

of the Corrected Motion and is referenced as the former Secretary of the Florida Department of Corrections (FDOC) as well. Plaintiff, on October 1, 2012, filed an Opposition to Defendant Gorge Delgado, M.D.'s Motion for Summary Judgment (Doc. #96).[2] He did not file any responses to the other motions for summary judgment.[3]

With regard to Defendant Buss, he was served in his official capacity as the Secretary of the FDOC. Return of Service (Doc. #38). Since Defendant Buss is no longer the Secretary of the FDOC, Defendant Secretary Michael D. Crews is automatically substituted as the Defendant Secretary for the official capacity claims in this action pursuant to Rule 25(d), Fed. R. Civ. P. Therefore, Defendant Buss, who remained in the case only in his official capacity,[4] is due to be dismissed from this action with prejudice.

In addition, Defendant Kenneth Tucker was automatically substituted for Edwin Buss for the official capacity claims in this action against the Secretary of the FDOC. Since Defendant Tucker

---

[2] Plaintiff was made aware of the provisions for responding to a motion for summary judgment in the Court's Order (Doc. #8), filed May 2, 2011, and given an opportunity to respond to the Defendants' motions for summary judgment.

[3] Plaintiff Epperson filed an Opposition to Defendants Buss, Davis, Gaxiola, Gonzalez, Smith, Willis, and Isra's Motion to Dismiss (Doc. #71) on May 2, 2012, and attached Medical Records, an Affidavit of Rodney C. Epperson, and Pain Management Records. The Court will liberally consider this to be a response to the motions for summary judgment.

[4] Defendant Buss was dismissed from this action, in his individual capacity, on August 2, 2012. See Order (Doc. #91).

is no longer the Secretary of the FDOC, Defendant Secretary Michael D. Crews is automatically substituted as the Defendant Secretary for the official capacity claims in this action pursuant to Rule 25(d), Fed. R. Civ. P.

Upon review, the Court will dismiss Defendant Jane Doe, LPN. As a general matter, fictitious-party pleading is not permitted in federal court; particularly, when the description is insufficient to identify the defendant among the many other nurses employed by the FDOC. See New v. Sports & Recreation, Inc., 114 F.3d 1092, 1094 n.1 (11th Cir. 1997). To date, Plaintiff has not identified nurse Jane Doe, the fictitious party. Therefore, she is due to be dismissed from the case.

Defendant D. Hall, LPN, was served with the Amended Complaint. See Doc. #43. She requested an extension of time to respond (Doc. #55), and was granted that request; however, she never submitted a response to the Amended Complaint. With regard to the claims raised against her, a review pursuant to 28 U.S.C. § 1915(e)(2)(B) will be undertaken.

The remaining Defendants are Dr. Page A. Smith; Dr. Francisca Ledesma; Dr. Jorge Delgado; Dr. Paiboon Isra; Warden Don Davis; Assistant Warden Michael L. Willis; Dr. Dora Gaxiola; Dr. M. Gonzalez; D. Hall, LPN; and Michael D. Crews, the Secretary of the Florida Department of Corrections, in his official capacity only. The remaining claims are: (1) Claim 1, in which Plaintiff raises an

- 3 -

Eighth Amendment claim against Defendants Smith, Ledesma, Delgado, Isra, Davis, Willis, Gaxiola, Gonzalez, and Hall for being deliberately indifferent to Plaintiff's serious medical needs; (2) Claim 2, in which Plaintiff raises an Eighth Amendment claim against Defendants Smith, Ledesma, Delgado, Isra, Davis, Willis, Gaxiola, Gonzalez, and Hall for being deliberately indifferent to his serious medical needs, and raises a claim against Defendant Davis for creating or enforcing a policy that is deliberately indifferent to Plaintiff's serious medical needs; and (3) Claim 3, in which Plaintiff raises a First Amendment claim that Defendants Smith, Ledesma, Delgado, Isra, Davis, Willis, Gaxiola, and Gonzalez have retaliated against Plaintiff for using the administrative grievance process.  As relief, Plaintiff seeks an award of compensatory and punitive damages.  He also seeks unspecified declaratory and injunctive relief.

## II.  Standard of Review

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

- 4 -

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Allen v. Bd. of Pub. Educ. for Bibb Co., 495 F.3d 1306, 1313 (11th Cir. 2007) (citations omitted).

> "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324, 106 S.Ct. 2548).[5]

Id. at 1314.

### III.  The Amended Complaint

The following factual allegations in the Amended Complaint are relevant to the remaining claims against the remaining Defendants. On June 10, 2010, Plaintiff was received into the FDOC at Central Florida Reception Center and advised the medical staff that he had been paralyzed in his lower extremities and underwent surgery for decompression of the spinal cord, fusion with plating, and had severe neurological damage.  He advised them he was in constant, severe pain, and he had not has been provided with his prescribed medications for pain and spasms since May 24, 2010.  He was referred to a physician who issued medical passes for a personal wheelchair

---

[5] Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

and a low bunk.  On June 11, 2010, Plaintiff completed a health appraisal form, listing spinal cord damage, chronic pain, and severe nerve damage.

On June 18, 2010, Plaintiff was examined by Mercede Cabaliero, M.D., and she informed Plaintiff that there was no documentation of his diagnosed medical conditions or medications prescribed by the Florida Avenue Pain Center or U-Care Clinic.  She advised that the medical records staff would call out to obtain the records.  Dr. Cabaliero prescribed Baclofen and issued medical passes for one year for a personal wheelchair, a low bunk, low tier housing, and shoes and a hat.  Medical records staff failed to make the call out to obtain the outside medical records.

On July 6, 2010, Plaintiff was transferred to the Reception and Medical Center (RMC) for a consultation with a cardiologist.  During the screening process, Plaintiff informed medical staff of his pre-existing medical condition, including suffering from constant severe pain and spasms, stress and depression, loss of appetite, lack of sleep, and anxiety attacks.  He explained that his condition was aggravated by the lack of prescribed medications.  Plaintiff was told to access sick-call.

On July 12, 2010, Plaintiff went to the RMC Emergency Room, complaining of severe chest pains, asthma attacks, and severe pain in his neck, back, legs, hands and feet.  Plaintiff informed Defendant Smith of his medical condition and that he had been on

pain management medication since 2003 due to his spinal cord injury. Defendant Smith informed Plaintiff he was opiate dependant, and then prescribed nitroglycerin and advised Plaintiff to access sick-call.

On July 13, 2010, Plaintiff re-injured his left shoulder trying to wheel his wheelchair up the steep sidewalk to J-dorm.  Plaintiff advised Ms. Eberhard in Mental Health that he had re-injured his shoulder and that he was in pain from his daily activities.  Ms. Eberhard advised Plaintiff to ask the medical records department to obtain his pain management records.  She advised that she could not assist Plaintiff with medical issues.

Plaintiff, on July 19, 2010, accessed sick-call and told Nurse Johnson about his pain and spasms, his shoulder injury, and his need for a refill of Baclofen for spasms.  Plaintiff was referred to a physician and charged a medical co-payment of $5.00.  On July 21, 2010, Plaintiff discussed his issues with Defendant Dr. Ledesma. She moved Plaintiff's left arm around to the point of pain, listened to Plaintiff's lungs, and looked through Plaintiff's medical records.  She told Plaintiff that his records reflected that he was opiate dependant, and now that he was in the FDOC, he was cured of his dependancy.  A friend of Plaintiff's contacted the Central Office to complain about Plaintiff's medical treatment.

On July 22, 2010, Plaintiff requested that Ms. Bielling obtain his medical records from archives.  Ms. Bielling advised Plaintiff he would be called out when the medical records arrived.  Plaintiff

- 7 -

filed a medical grievance and an ADA complaint on August 1, 2010. On August 4, 2010, Plaintiff was called to the medical records department to review his records from 2000 to 2009. He was advised that the records would be kept in the medical records department for physicians to review in treating Plaintiff. When Plaintiff asked Ms. Bielling for assistance in obtaining treatment, she told him she would see if K. Herriott, ARPN, would evaluate Plaintiff.

Plaintiff declined to attend an appointment with Dr. Ledesma on August 12, 2010, because Plaintiff believed she refused to acknowledge his medical condition and refused to render treatment. Plaintiff grieved his medical care, and the grievances were denied by Defendant Smith and Secretary McNeil. On August 18, 2010, Plaintiff attended an appointment with K. Herriott, ARPN. She prescribed a 2800 calorie diet and ordered an x-ray for his shoulder injury. She sought to diagnose the cause of pain upon movement, to obtain a consultation for the brace clinic, and to set up physical therapy at the orthopedic clinic so Plaintiff could learn to walk.

On September 14, 2010, Plaintiff was escorted to Dr. Ledesma's examination room for a wheelchair re-evaluation. Dr. Ledesma directed Plaintiff to get on the examination table, and Plaintiff was able to get on the table. She tapped his left knee with a rubber instrument, and both legs responded spastically. Plaintiff told her his medical condition. She decided to discontinue his wheelchair. Plaintiff told her about his records from 2003-2009 and

- 8 -

the need for a wheelchair.  He said the neurologist recommended a wheelchair because if Plaintiff kept falling down attempting to walk, he might end up being paralyzed for life.  Plaintiff explained that his legs collapsed without cause because of severe neurological damage from spinal cord compression, and that he could not walk up and down RMC's huge compound.  Dr. Ledesma determined that a walker with a seat for when Plaintiff got tired was advisable.  She commented that Plaintiff was in the FDOC, so he was cured. Plaintiff asserts that she denied requested medical treatment in retaliation for complaints to Central Office staff and other grievances.  Dr. Ledesma ordered medical staff to seize Plaintiff's wheelchair.  Plaintiff was transferred to a bench when both lower extremities went spastic.  The medical staff refused Dr. Ledesma's directive to take Plaintiff's wheelchair and issue a walker with a seat fearing liability for Plaintiff falling and injuring himself. The medical staff informed Dr. Husseini of Dr. Ledesma's decision to discontinue the wheelchair.

Plaintiff filed grievances about his medical care, which were denied by Defendant Smith in retaliation for Plaintiff's complaints to Central Office concerning Defendant Smith and Dr. Ledesma.  These grievances were denied by Secretary McNeil as well.

On September 16, 2010, Plaintiff was taken, by transport wheelchair, to the RMC Emergency Room due to chest pains and severe spasms.  Plaintiff complained about his medical care and Dr.

- 9 -

Ledesma's decision to discontinue his wheelchair. Defendant Smith said he was writing a consult for a cardiologist. Defendant Smith told Nurse Summerall to get Plaintiff out of the ER wheelchair, which she did. Plaintiff told her he could not walk to the dorm, and she responded that was Plaintiff's problem. Another inmate attempted to assist Plaintiff to his dorm, but Plaintiff's leg went spastic. A sergeant ordered an inmate to transport Plaintiff in a wheelchair to E-dorm, where Plaintiff's wheelchair was located. Plaintiff was in severe pain with spasms and chest pains. Plaintiff told the Mental Health Staff about the denial of medical treatment. He continued to file grievances concerning the actions of Defendant Smith and Nurse Summerall. These grievances were denied by Defendant Smith and Secretary McNeil in retaliation for Plaintiff's complaints.

On a call out to Dr. Husseini on September 24, 2010, Plaintiff's wheelchair medical pass was reinstated. Plaintiff refused a medical call-out with Dr. Ledesma on September 28, 2010. Plaintiff was seen by Dr. Vivas. Plaintiff informed Dr. Vivas he would be refusing to attend any scheduled appointments with Dr. Ledesma due to her decision to discontinue Plaintiff's wheelchair pass and her expressed belief that he was cured. Dr. Vivas said he would review Plaintiff's medical records from the Family Health Care Florida Avenue Pain Center when they were received and would assess

Plaintiff's need for pain and spasm medications.  Dr. Vivas issued medical passes for long johns and an extra cotton blanket.

On September 29, 2010, Plaintiff reviewed his pain management records received from the Florida Avenue Pain Center, where Plaintiff was a patient from February 2009 to May 2010.  Ms. Bielling placed these records in Plaintiff's medical records for physicians to be able to review when addressing Plaintiff's medical condition.

Plaintiff's grievances were denied by Defendant Smith in retaliation for Plaintiff's complaints.  Secretary McNeil denied the grievance appeals.  Plaintiff submitted an ADA Discrimination Complaint to the United States Department of Justice.

Plaintiff saw Dr. Delgado on October 20, 2010.  Plaintiff began to describe his varied medical complaints, but Dr. Delgado told him he was there to discuss why Plaintiff was not complying with the 2800 calorie diet.  Plaintiff told Dr. Delgado that he went to every meal, but he did not eat much because of his medical condition.  Plaintiff also told the doctor that his medical records from 2003 to 2009 were available.  Dr. Delgado said he was not concerned with the medical records and other complaints, and he issued Plaintiff a medical diet pass.  On October 26, 2010, Plaintiff filed a medical grievance concerning his shoulder injury and denial of medical treatment.

- 11 -

Plaintiff attended his first physical therapy session on November 1, 2010. It caused him severe pain and spasms, and aggravated his shoulder injury, neuralgia, neck and back pain. On November 2, 2010, Plaintiff woke up in his wheelchair, screaming and crying in pain and suffering from spasms. On November 2, 2010, Plaintiff was seen by the orthopedic surgeon to evaluate his shoulder injury. Plaintiff described his medical condition and told the surgeon he was not on any pain medication. He was discharged from the clinic with a recommendation for a neurology consultation.

On November 3, 2010, Plaintiff refused physical therapy because he was in constant, severe pain and suffered from spasms. On November 19, 2010, Dr. Delgado conducted a wheelchair re-evaluation, retaliating against Plaintiff for his complaints and undermining Dr. Husseini's authority in reinstating the medical wheelchair pass on September 24, 2010. Dr. Delgado directed Plaintiff to sit in a chair by his desk. Plaintiff transferred from his wheelchair to the chair. Dr. Delgado tapped Plaintiff's left knee with a rubber instrument and both legs went spastic. Dr. Delgado requested that Plaintiff discontinue the use of the wheelchair. Plaintiff tried to present him with his medical and pain management records. Plaintiff described being in constant severe pain with spasms, suffering from a shoulder injury, and losing weight from not eating and sleeping due to stress and anxiety attacks. Plaintiff requested medication and medical treatment. Dr. Delgado said he was

- 12 -

submitting a neurology consultation request so that a determination could be made as to whether Plaintiff should remain in a wheelchair. He advised Plaintiff that he was not issuing a wheelchair medical pass until the results of the neurology consultation were received. Plaintiff told him that there was no medical procedure to correct his severe neurological damage from the spinal cord compression, and that he had seen neurologists in the past. Plaintiff complained about the RMC medical staff trying to cause him injury rather than taking the time to review the medical records. Dr. Delgado ordered Plaintiff out of the examination room.

Plaintiff made a sick call request on December 13, 2010. He complained about his medical condition and the need for a wheelchair assistant and presented a copy of his medical and pain management records to Nurse Jane Doe. She advised Plaintiff that he had an upcoming neurology appointment and he could address his concerns at that appointment. Plaintiff requested to see Dr. Vivas, and that request was denied. Plaintiff was charged $5.00 as a medical co-payment and given no medical treatment. On December 16, 2010, Plaintiff was transferred from RMC to Columbia Correctional Institution Annex (CCI). During his medical screening, Plaintiff related his medical condition and requested a wheelchair assistant. He was advised to access sick call and to have his medical passes converted from RMC to CCI passes.

Plaintiff accessed sick call on December 18, 2010.  Defendant Allen told Plaintiff he had a neurology appointment scheduled and an upcoming Chronic Clinic to address Plaintiff's medical concerns with a doctor.  Plaintiff was charged a $5.00 co-payment and not provided with medical treatment.

On December 30, 2010, Plaintiff attended the Chronic Clinic and was seen by Defendant Dr. Isra.  Plaintiff presented her with his medical and pain management records, which she refused to acknowledge.  He also told her about his pain and spasms and the medications he wanted her to prescribe.  She said, "he no hear, don't talk, RMC no prescribe medications, I not, don't talk." Plaintiff became irate and told her he was tired of being denied medical treatment.  Dr. Isra responded: "don't talk."  Plaintiff mentioned that his medical passes, including his diet pass, would not be honored.  Dr. Isra told Plaintiff not to talk and to leave the office.  She denied any medical treatment.

Plaintiff accessed sick call on January 5, 2011, and advised Defendant Allen that he had not received converted medical passes. She said she would have the doctor sign the medical passes. Plaintiff presented his medical records and requested pain medicine and treatment.  Defendant Allen did not provide medical treatment, and Plaintiff was charged $5.00 medical co-payment. Defendant Allen said she would write the medical passes.

- 14 -

On January 13 and January 14, 2011, food services denied Plaintiff his 2800 calorie diet. Dr. Isra directed Defendant Gaxiola to review the medical records, and it was determined that Plaintiff did not meet the FDOC criteria (height and weight standard) for the 2800 calorie diet. Plaintiff said this was done in retaliation for Plaintiff's use of the grievance procedure against Defendant Isra. Defendant Isra responded to Plaintiff's medical grievances, along with Defendants Davis and Willis, denying Plaintiff's requested medical treatment in retaliation for the use of the grievance system.

Plaintiff told the Mental Health Staff that he was not sleeping and eating, he was suffering from anxiety attacks and depression, and his condition was due to constant pain and spasms and being denied medical treatment. Plaintiff's medical grievances were denied by Defendants Isra, Davis, and Willis in retaliation for his use of the grievance system. Secretary Buss denied requested treatment.

On February 25, 2011, Plaintiff accessed sick call seeking treatment for pain and spasms, a medical diet, the repair of his wheelchair foot pad, and a doctor's appointment. Nurse Marshall told Plaintiff that Defendant Davis required that Plaintiff had to access sick call three times before a doctor's appointment could be scheduled. A medical co-payment was charged, and Nurse Marshall did not provide medical treatment.

On March 14, 2011, Plaintiff told the Mental Health Staff about being denied medical treatment. On March 21, 2011, Plaintiff was transported to RMC for a neurology consultation per Dr. Delgado's request. Dr. Gama, a neurologist, examined Plaintiff and recommended Baclofen for spasms, Tylenol #3 for pain and spasticity, referral to pain management and return to the neurology clinic as needed. On March 23, 2011, Defendant Dr. Gonzalez prescribed Baclofen and Tylenol #3, but placed a hold on Tylenol #3 until the Baclofen was completed. He noted the pain management referral. On March 23, 2011, Defendant Gonzalez requested authorization for Baclofen for 180 days, which was approved. It was issued in a single dose format on March 25, 2011.

On April 8, 2011, Plaintiff accessed sick call requesting medical treatment for pain and spasms, and complaining about nausea and vomiting since taking Baclofen. He complained about pain when moving his left arm due to the shoulder injury. Nurse Marshall advised Plaintiff to discontinue the Baclofen. Plaintiff was charged the co-payment. Plaintiff reported to the medical window and refused the Baclofen based on the advice of Nurse Marshall.

Plaintiff filed medical grievances which were denied by Defendants Gaxiola and Davis in retaliation for his use of the grievance procedure. Secretary Buss also denied Plaintiff's request for medical treatment. Defendant Gaxiola directed Defendant Gonzalez to prescribe an alternative pain medication for Tylenol #3.

Without consulting Plaintiff's medical records, Defendant Gonzalez prescribed Motrin 600 mg. (Ibuprofen), which Plaintiff is allergic to and the allergy is documented in Plaintiff's medical records. When Plaintiff went to the medical window, he was issued Ibuprofen, and Plaintiff advised the staff that he was allergic to Ibuprofen. The medication was taken back, but Plaintiff was denied the opportunity to sign a refusal form.

Plaintiff filed grievances complaining that Secretary Buss refused to respond to his medical grievance appeals within thirty days, pursuant to the rules.

On May 27, 2011, Plaintiff accessed sick call to request a referral to a doctor, as directed by Nurse Marshall. Plaintiff asked Nurse Allen to schedule an appointment with a doctor to re-prescribe pain medication since he was allergic to Motrin. He requested a referral to pain management and neurology clinic and medical treatment for his shoulder injury and pain and spasms. Nurse Allen said she was going to take Plaintiff's medical records to Dr. Gonzalez, and she would schedule an appointment for the following week. She provided Plaintiff with eight packs of Tylenol and a $5.00 medical co-payment was charged.

On June 2, 2011, Plaintiff filed a medical grievance, which was denied by Defendants Gaxiola and Davis in retaliation for Plaintiff's use of the grievance system. Secretary Buss failed to respond to the medical grievance appeals. On June 16, 2011,

Plaintiff accessed sick call requesting treatment, pass renewal, referral to pain management and neurology clinic, and medication for his pain and spasms.  Nurse Hall told Plaintiff she was taking Plaintiff's medical record to Dr. Gonzalez for his review.  Dr. Gonzalez failed to provide medical treatment.

Plaintiff was seen on June 24, 2011, by Dr. Gonzalez in the Chronic Clinic.  Plaintiff presented multiple complaints to Dr. Gonzalez and attempted to provide him with medical and pain management records.  Epperson requested medical passes, sun block, a straw hat, and pain medication.  Dr. Gonzalez responded that Plaintiff should not tell him what to do as he is the doctor.  Dr. Gonzalez did issue a medical pass for a straw hat.

Numerous prisoners at CCI received medical treatment from and were prescribed narcotic pain medication by Dr. Gaxiola and Dr. Gonzalez.  Plaintiff submitted a medical grievance to Defendant Davis on June 27, 2011, asking for medical treatment.  Defendant Gaxiola responded, stating that Plaintiff refused to take Baclofen, without re-prescribing a medication or following the neurologist's recommendations.  Defendants Gaxiola, Gonzalez, and Willis denied Plaintiff medical treatment, and former Secretary Buss failed to respond to medical grievance appeals.

On June 27, 2011, Plaintiff accessed sick call.  Defendant Hall informed Plaintiff that Secretary Buss had no money for special doctors due to budget cuts.  On July 11, 2011, Plaintiff accessed

- 18 -

sick call requesting medical treatment, including referral to pain management and neurology clinics, and requesting the issuance of sun block and a straw hat. Nurse Allen informed Plaintiff that the FDOC no longer had speciality doctors at RMC, and RMC was being converted to medical needs housing. Nurse Burke confirmed that the institution could no longer purchase sun block and straw hats.

On July 14, 2011, Plaintiff informed Mental Health Staff that he was not receiving medical treatment for his ailments. On July 24, 2011, Plaintiff forwarded a request form to Nurse Everett asking for an inmate assistant. This request was put on hold by RN Supervisor Travis Rhoden. Plaintiff forwarded another request form to Defendant Warden Davis and Travis Rhoden asking for medical treatment. Plaintiff has not received assistance from them.

## IV.  Findings of Fact and Conclusions of Law

### A.  Eighth Amendment Claims Against Defendant Jorge Delgado, M.D.

In order to prevail in a 42 U.S.C. § 1983 action, Plaintiff Epperson must demonstrate: "(1) that the defendant deprived [him] of a right secured under the Constitution or federal law and (2) that such a deprivation occurred under color of state law." Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (citing Arrington v. Cobb Co., 139 F.3d 865, 872 (11th Cir. 1998)). Here, Plaintiff claims he was subjected to an Eighth Amendment violation by the actions of Defendant Delgado. "The Eighth Amendment of the United States Constitution forbids 'cruel and unusual punishments.'

- 19 -

U.S. Const. amend. VIII.  The Eighth Amendment is applicable to the states through the Fourteenth Amendment." Id. (citation omitted). The Eighth Amendment's prohibitions against cruel and unusual punishments includes "deliberate indifference to serious medical needs of prisoners." Estelle v. Gamble, 429 U.S. 97, 104 (1976).

A serous medical need is defined as "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003) (quotations omitted).  There are two components which must be satisfied, an objective one and a subjective one. Bingham, 654 F.3d at 1175.  "Initially, a plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of the defendant's denial was sufficiently serious.  Additionally, the plaintiff must make a 'subjective' showing that the defendant acted with 'a sufficiently culpable state of mind.'" Quirindongo v. Martinez, No. 1:CV-10-01742, 2012 WL 2923996, at *16 (M.D. Pa. July 18, 2012) (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)).

To demonstrate that the official had the subjective intent to punish, the prisoner is required to show: "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; and (3) by conduct that is more than mere negligence." Bingham, 654 F.3d at 1176 (quoting Brown v. Johnson, 387 F.3d 1344, 1351 (11th Cir.

2004)).  If pain is intentionally inflicted on an inmate or if the inmate is subjected to undue suffering or the threat of tangible residual injury, a deliberate indifference to a serious medical need is demonstrated.  <u>Quirindongo</u>, 2012 WL 2923996, at *16 n.6.

For purposes of this decision, the Court will assume that Plaintiff has presented operative facts showing a serious medical need and satisfied the objective component of the Eighth Amendment by showing that his medical condition was sufficiently serious to warrant medical attention and consideration.  With regard to the subjective component of an Eighth Amendment violation, Plaintiff must establish that Defendant Delgado had subjective knowledge of a risk of serious harm to Plaintiff and that Defendant Delgado disregarded that risk.  Indeed, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Farmer v. Brennan</u>, 511 U.S. 825, 837 (1994).

Plaintiff was seen by Dr. Delgado on two occasions: on October 20, 2010 for a diet pass re-evaluation, and on November 19, 2010, for a wheelchair pass re-evaluation.  In the Affidavit of Jorge Delgado, M.D. (Dr. Delgado's Affidavit) (Exhibit 2) (Doc. #83-2), he attests that prior to and/or during each encounter with Plaintiff, he would have reviewed Plaintiff's medical records.  Dr. Delgado explains that on October 20, 2010, Plaintiff was presented to him for a diet pass evaluation.  <u>Id</u>.  And, although the visit was

- 21 -

designated for this limited purpose, when Plaintiff made subjective
complaints of pain and spasticity in the lumbar spine and lower
extremities, Dr. Delgado performed a physical examination and noted
his findings. Id. Additionally, he renewed Plaintiff's 2800
calorie diet pass.

The Chronological Record of Health Care (Exhibit 3) (Doc. #83-
3) for October 20, 2010, shows that Dr. Delgado evaluated Plaintiff
for a diet pass renewal. Plaintiff medical history and current
medical condition were noted. Id. Dr. Delgado recorded that
Plaintiff was wheezing and overweight. Id. A BMI of 26 was
documented, and a diet pass was renewed. Id.

With respect to his second encounter with Plaintiff, which
occurred on November 19, 2010, Dr. Delgado attests that Plaintiff
was presented to him for the limited purpose of a wheelchair
evaluation. Dr. Delgado's Affidavit. However, when Plaintiff made
subjective complaints about pain, Dr. Delgado evaluated Plaintiff
and noted his findings. Id. He recommended that Plaintiff
discontinue use of a wheelchair and to return to physical therapy
in order to alleviate his pain and to prevent blood clots. Id.
Plaintiff refused this recommendation. Id. "For that reason, [Dr.
Delgado] referred Plaintiff to a neurologist and ordered no changes
to his wheelchair pass pending the results of the neurologic
consultation." Id.

The Chronological Record of Health Care (Exhibit 5) (Doc. #83-5) contains Dr. Delgado's notes from November 19, 2010.  Therein Plaintiff's physical condition is noted, and it is also stated that Plaintiff refused to continue with physical therapy.  Id.  Dr. Delgado's physical examination is recorded, along with Plaintiff's ability to transfer himself from a chair.  Id.  Dr. Delgado recommended that Plaintiff continue with physical therapy, discontinue use of a wheelchair, and begin utilizing a walker.  Id. Dr. Delgado advised that physical therapy would help prevent clots and reduce pain.  Id.  Plaintiff refused to accept Dr. Delgado's medical advice.  Id.  Dr. Delgado decided to make no changes on the wheelchair pass until a neurological consult could be obtained.  Id.

Matters of medical judgment do not rise to the level of deliberate indifference.  Estelle v. Gamble, 429 U.S. at 107.  Based on a review of the doctor's notes on the Chronological Record of Health Care, Defendant Delgado was obviously aware of Plaintiff's medical condition and history.  When Plaintiff presented medical complaints, Dr. Delgado considered those complaints, examined Plaintiff, and made objective findings.  He renewed Plaintiff's diet pass, expressing his concern about Plaintiff's obesity and wheezing. Dr. Delgado also recommended pain management and a walker. Plaintiff cannot establish deliberate indifference by stating that although he received medical attention, he wanted different modes of treatment (pain medication) rather than reporting to physical

- 23 -

therapy and attempting to use a walker to relieve his pain and spasms.  See Hamm v. DeKalb Co., 774 F.2d 1567, 1575 (11th Cir. 1985), cert. denied, 475 U.S. 1096 (1986).  Of great import, when Plaintiff refused to accept Dr. Delgado's medical advice to continue with physical therapy to prevent clots and pain and to discontinue using a wheelchair and to use a walker, Dr. Delgado, in the alternative, requested a neurological consultation to assess Plaintiff's medical needs.

Plaintiff has not satisfied the subjective component of his claim of deliberate indifference to a serious medical need.  He has presented no substantial evidence to rebut Dr. Delgado's statements that he never refused to treat Plaintiff and he used sound medical judgment when treating Plaintiff.  Additionally, Plaintiff has failed to present operative facts to rebut Dr. Delgado's statements that Plaintiff's requests for medical care were carefully reviewed and considered.[6]  In sum, Plaintiff has not shown that Defendant Delgado acted with deliberate indifference to a serious medical need.

---

[6] Although Plaintiff contends that Defendant Delgado, on October 20, 2010, failed to review his pain management records from the Florida Avenue Pain Clinic, those records were not submitted to the Florida Department of Corrections until October 29, 2010, per the facsimile transmittal date.  Florida Avenue Pain Center Records, Exhibit 4 (Doc. #83-4).  Additionally, based on the notations in the FDOC Chronological Record of Health Care, Dr. Delgado was fully aware of Plaintiff's medical history and made his recommendations after considering that history.

The Court finds that Defendant Delgado has met his initial burden of showing the Court that there are no genuine issues of material fact that should be decided at trial.  Defendant has presented evidence that, during the pertinent time frame, he responded appropriately to Plaintiff's medical needs.  Plaintiff has not demonstrated that Defendant Delgado's responses to Plaintiff's medical needs were poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in treatment, or even medical malpractice actionable under state law.  Taylor v. Adams, 221 F.3d 1254, 1258 (11th Cir. 2000) (citing Estelle v. Gamble, 429 U.S. 97, 105-06 (1976)), cert. denied, 531 U.S. 1077 (2001).  Indeed, Epperson's "disagreement with the course of treatment" chosen by Dr. Delgado "does not 'support a claim of cruel and unusual punishment.'" See Moots v. Sec'y, Dep't of Corr., 425 Fed.Appx. 857, 858 (11th Cir. 2011) (per curiam) (not selected for publication in the Federal Reporter) (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)).

**B. Eighth Amendment Claims Against Defendant Francisca Ledesma, M.D.**

Plaintiff was seen by Dr. Ledesma on two occasions: on July 21, 2010 for a shoulder injury, and on September 14, 2010, for a wheelchair pass re-evaluation.  In the Affidavit of Francisca Ledesma, M.D. (Dr. Ledesma's Affidavit) (Doc. #90), she attests that on July 21, 2010, Plaintiff complained of shoulder pain.  She performed a physical examination of Plaintiff and determined that

there were "no skeletal findings that correlated with Plaintiff's subjective complaints. <u>Id</u>. Although Plaintiff requested pain medication, she determined that a prescription was not necessary. <u>Id</u>. She planned a follow-up visit with Plaintiff on August 12, 2010, to assess Plaintiff's shoulder condition; however, Plaintiff refused the visit.[7] <u>Id</u>.

Dr. Ledesma also attests that she saw Plaintiff on September 14, 2010, with respect to a wheelchair re-evaluation. <u>Id</u>. She states that based on her review of Plaintiff's chart, his description of the symptoms, and on the examination of Plaintiff, she decided to discontinue Plaintiff's wheelchair pass. <u>Id</u>. In the alternative, she prescribed a walker with a seat. <u>Id</u>. Additionally, she submitted a consultation request to the brace clinic and to physical therapy. <u>Id</u>.

The Chronological Record of Health Care shows that on July 21, 2010, Plaintiff requested hydrocodone for his shoulder pain. Medical Records, Exhibit A1 (Doc. #90). After conducting a physical examination, Dr. Ledesma determined there were no objective findings to support Plaintiff's request for hydrocodone for pain. <u>Id</u>. Defendant Ledesma did not simply discontinue Plaintiff's wheelchair pass. <u>Id</u>. Instead, she recommended he use a walker with a seat,

---

[7] Since Plaintiff refused to see Dr. Ledesma for his shoulder injury, she was not given the opportunity to re-assess Plaintiff's medical needs, nor was she given the opportunity to determine whether his shoulder condition had worsened.

and she made two consultation requests: one for orthotics, seeking aid in ambulation and measures to address his gait disorder; and one for physical therapy, to evaluate Mr. Epperson for gait improvement. Medical Records, Exhibit A1 (Doc. #90), Consultation Request/Consultant's Report to Orthotics and to Physical Therapy.

Assuming Plaintiff has demonstrated a sufficiently serious medical need, Defendant Ledesma was not deliberately indifferent to any "serious" medical needs. Quite to the contrary, the chronology of his medical evaluations and treatments reflect that Dr. Ledesma examined Plaintiff, evaluated his medical condition, and made her considered recommendations. Of note, pain medication was readily available on the wing.[8]

The fact that Plaintiff was dissatisfied with the type of treatment he received does not mean he was subjected to cruel and unusual punishment. At most Plaintiff has shown a disagreement with the course of treatment: "[A] difference of opinion over matters of medical judgment does not give rise to a constitutional claim." Tedesco v. Johnson, 119 F.Supp.2d 1320, 1327 (M.D. Fla. 2000) (citing Massey v. Hutto, 545 F.2d 45 (8th Cir. 1976)). It is quite apparent that the prison doctors did not want to place Plaintiff back on a cycle of opiate pain medications and were attempting to put him on a regimen of care to help him walk again. The doctors

---

[8] Plaintiff was advised that Tylenol was available in the dormitory, and he could request Tylenol (Acetaminophen) from the dorm officer. Exhibit C, Response (Doc. #85-3).

made varied recommendations, including consultations, to attempt to provide Plaintiff with physical therapy and exercise and to promote alternative devices, like braces and a walker, to allow him to gain strength and coordination and walk again.

Of significance, Plaintiff, three weeks after being released from prison, stopped using a wheelchair. Exhibit B12 (Doc. #85-2 at 27). He currently walks with a cane. Id. Additionally, although he rejected physical therapy in prison, he started exercising after his release from prison. Id. He admitted that "it's never been that I actually can't walk, it's the fact that my legs, because of the neurological damage, without reason just collapse." Id.

Plaintiff rejected considered medical opinions and recommendations, refusing physical therapy and refusing to relinquish the wheelchair and convert to the use of a walker with a seat. Even assuming Plaintiff Epperson has satisfied the objective component by showing that he had a serious medical need, he has not shown deliberate indifference on the part of Dr. Ledesma. And, while Plaintiff disagrees with the course of treatment chosen by the medical providers, the medical decisions were in accordance with acceptable standards of medicine and did not constitute wanton conduct. Plaintiff has failed to provide any competent medical evidence to support his claim that the Defendants were deliberately indifferent to his serious medical needs. He opines that they

should have provided him with pain medication and other treatment, but this disagreement with the course of treatment does not establish that he was subjected to cruel and unusual punishment.

## C.  **Eighth Amendment Claims Against Defendant D. Hall, LPN**

With respect to the claims raised against Defendant Hall, a review pursuant to 28 U.S.C. § 1915(e)(2)(B) will be undertaken. The Prison Litigation Reform Act requires this Court to dismiss this case at any time if the Court determines that the allegation of poverty is untrue, 28 U.S.C. § 1915(e)(2)(A), or the action is frivolous, malicious, fails to state a claim upon which relief can be granted or seeks monetary relief against a defendant who is immune from such relief.  See 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). Additionally, the Court must read Plaintiff's pro se allegations in a liberal fashion.  Haines v. Kerner, 404 U.S. 519 (1972) (per curiam).

"A claim is frivolous if it is without arguable merit either in law or fact." Bilal v. Driver, 251 F.3d 1346, 1349 (11th Cir.) (citing Battle v. Central State Hospital, 898 F.2d 126, 129 (11th Cir. 1990)), cert. denied, 534 U.S. 1044 (2001).  A complaint filed in forma pauperis which fails to state a claim under Fed.R.Civ.P. 12(b)(6) is not automatically frivolous.  Neitzke v. Williams, 490 U.S. 319, 328 (1989).  Section 1915(e)(2)(B)(i) dismissals should only be ordered when the legal theories are "indisputably meritless," id. at 327, or when the claims rely on factual

allegations which are "clearly baseless." Denton v. Hernandez, 504 U.S. 25, 32 (1992). Additionally, a claim may be dismissed as frivolous when it appears that a plaintiff has little or no chance of success. Bilal v. Driver, 251 F.3d at 1349.

In reviewing the Amended Complaint, the initial inquiry must focus on whether the two essential elements to a § 1983 action are present: (1) whether the person engaged in the conduct complained of was acting under color of state law; and (2) whether the alleged conduct deprived a person of rights, privileges or immunities guaranteed under the Constitution or laws of the United States. Houston v. Williams, 547 F.3d 1357, 1360-61 (11th Cir. 2008) (citing 42 U.S.C. § 1983). Regardless of whether Plaintiff satisfies the first element, in the absence of allegations of a constitutional deprivation or a violation of a federal right, Plaintiff cannot sustain a cause of action against a Defendant under § 1983.

Plaintiff was seen by Defendant Hall on two occasions: on June 16, 2011 for sick call, and on June 27, 2011 for sick call. In the Amended Complaint, Plaintiff states that on June 16, 2011, he accessed sick call requesting treatment, pass renewals, referrals, and medication, and in response to his request, Defendant Hall told him she was taking Plaintiff's medical record to Dr. Gonzalez for his review. Plaintiff claims that Dr. Gonzalez failed to provide medical treatment. Plaintiff states that on June 27, 2011,

Defendant Hall told him that due to budget cuts, speciality doctors were no longer employed by the FDOC.

Plaintiff's allegations against Defendant Hall do not support a claim of deliberate indifference. Nurse Hall's action of taking Plaintiff's medical complaints and record to Dr. Gonzalez does not support a plausible deliberate indifference claim pursuant to the Eighth Amendment of the United States Constitution. Nurse Hall's comment that the FDOC no longer had money in its budget for employing in-house speciality doctors is not an act or omission sufficiently harmful to evidence deliberate indifference to serious medical needs. This Court is convinced that Plaintiff has little or no chance of success on an Eighth Amendment claim of constitutional deprivation against Defendant Hall, and his Eighth Amendment claims against her should be dismissed as frivolous.

**D.  Eighth Amendment Claims Against Defendants Smith, Isra, Gonzalez, Gaxiola, Willis, Davis, and Crews[9]**

In the Amended Complaint, Plaintiff complains about the medical care he received from Defendants Smith, Isra, Gonzalez and Gaxiola. Defendant Dr. Page Smith, in the Declaration of Page Smith, Exhibit C (Doc. #87-3), states that she provided two Emergency Room consultations in July and September 2010. She explains:

---

[9] When the Corrected Motion for Summary Judgment (Doc. #92) was filed, Kenneth Tucker was the Secretary of the FDOC. Michael D. Crews, in his official capacity as the Secretary of the FDOC, has been substituted as the proper Defendant.

> The ER is for medical conditions that are
> serious and must be addressed immediately.  For
> medical conditions that are not such an
> emergency, the inmate patient should have his
> medical condition or complaints evaluated
> through sick-call.  In the ER, the nurse first
> takes/records the patient's vital signs and
> assesses the patient's complaints, and then
> refers the complaints that the nurse determines
> need to be immediately addressed to the on-duty
> physician.

Id. at 2 (enumeration omitted).

She described the treatment Plaintiff received in the Emergency

Room:

> Epperson was first referred to me as the
> on-duty physician in the ER on July 12, 2010,
> at approximately 6:45 p.m. (1845 hours).  The
> ER nurse noted the following emergent
> complaints; on going asthma attacks and pace
> maker flutter.  The recorded vital signs were
> normal.  She noted a 98% oxygen saturation
> level which is also normal.  I noted that he
> had a few chronic complaints, but had no
> acute/emergency issues associated with his
> asthma or his coronary heart disease ("CHD").
> Still, even though he did not demonstrate any
> emergent conditions, I prescribed nitroglycerin
> ("NTG") as needed, if he developed any chest
> pain later.

Id. (enumeration omitted).

She described her second encounter with the Plaintiff in the

Emergency Room:

> Epperson was referred to me as the on-duty
> physician in the ER the second time on
> September 16, 2010, at 4:00 a.m. (0400 hours).
> The ER nurse noted that he arrived alert and
> oriented, that he had chief complaints of mid
> sternal chest pain, a heavy weight on chest,
> neck pain, tingling in his left arm, and mild
> shortness of breath ("SOB").  The nurse also

- 32 -

noted that inmate had two stints and pacemaker placed in 2007 after a myocardial infarction ("MI"), which is a heart attack. The recorded vital signs were normal.

At that time, I noted that Epperson complained of chest pain ("CP") which started the day before which was initially midsternal but now radiates down his left arm, and that he had shortness of breath/tingling but had no nausea or vomiting symptoms. I evaluated his symptoms, noting that his head, ears, eyes, nose, throat ("HEENT") were fine, his lungs were clear, heart beat was normal, and that he had an abnormal EKG. I ordered blood tests to be taken. The initial lab results were reported at 5:39 a.m. Thereafter, as a result of my physical assessment of Epperson along with the initial lab results, I determined that the complaints were not consistent with a heart attack. I prescribed aspirin ("ASA") daily to prevent platelets from forming in his blood and rescheduled his pacemaker clinic to September 2010. Epperson was then released to security at 7:55 a.m. at which time I was most likely no longer there because, between 7:30 and 8:00 a.m., I typically prepared for my daytime duties as the MED.

Id. (enumeration omitted).

Dr. Smith further attests that she did not direct anyone to remove Epperson from his wheelchair, as "[a]ccording to procedure, inmates who come to the ER in a wheelchair, leave in a wheelchair[.]" Id. This policy holds true even if the inmate does not have a pass for the wheelchair. Id.

In the Amended Complaint, Plaintiff complains that he arrived at the Emergency Room on July 12, 2010, with severe chest pains and asthma attacks, along with other pain, and he was seeking pain medication. He claims that Dr. Smith told him he was opiate

- 33 -

dependant, she prescribed nitroglycerin, and she advised Plaintiff to access sick-call for his routine medical needs.  He also states that he was taken by transport wheelchair to the Emergency Room on September 16, 2010, with chest pains and severe spasms.  Dr. Smith told Plaintiff she was writing a consult for a cardiologist. Plaintiff states that Dr. Page told Nurse Summerall to remove Plaintiff from the ER wheelchair, he was removed from the wheelchair, and eventually was transported by wheelchair to E-dorm, where his personal wheelchair was located.

The Emergency Room Record for July 12, 2010 shows no acute emergency issues with a few chronic complaints.  Exhibit B (Doc. #87-2 at 3).  It also reflects that nitroglycerine was prescribed. Id.  The Emergency Room Record for September 16, 2010 reflects that there was an abnormal EKG, and Dr. Page decided to reschedule Plaintiff's pacemaker clinic to September and to prescribe daily aspirin.  Exhibit B (Doc. #87-2 at 15).  This record shows that Plaintiff was seen by Dr. Page, she considered Epperson's complaints, examined him, ordered blood tests, reviewed the blood test results, found the EKG to be abnormal, directed that he take aspirin daily, and rescheduled the pacemaker clinic.  Id.

The only personal involvement Dr. Paiboon Isra had with Plaintiff was one consultation at the Chronic Clinic on December 30, 2010.  Ex. B (Doc. #87-2 at 32)  It was noted that Plaintiff had respiratory, cardiovascular, and gastrointestinal illnesses.  Id.

- 34 -

Plaintiff complained that his left leg shakes and sometimes his left arm, that he has left leg weakness, and that he had a spinal cord injury in 2003. _Id_. Dr. Isra reviewed Plaintiff's record. Lab results were considered, and medications were noted. _Id_. Vital signs were taken. _Id_. Plaintiff's BMI was found to be normal. _Id_. Dr. Isra noted that Plaintiff had seen a specialist, a neurosurgeon, who determined that nothing much could be done to relieve the symptoms in his extremities. _Id_. Dr. Isra made her assessment of Plaintiff's condition, including cervical cord compression and myelopathy, COPD, and heart problems aided by a pacemaker. _Id_. She renewed Plaintiff's medications and scheduled a follow-up visit. _Id_.

Dr. Isra, in the Declaration of Paiboon Isra, attests:

> On December 30, 2010, I had the chronic clinic consultation with Epperson for respiratory, cardiovascular, and gastrointestinal conditions. Epperson had regular checkups at the chronic clinic for his asthma, COPD which is related to his cigarette smoking, pacemaker, and Hepititis [sic]. At that time, Epperson indicated that his left leg shakes, sometimes his left arm, that he had left leg weakness, and that he had a spinal cord injury in 2003. I then reviewed Epperson's record, renewed his medications, and noted that his body mass index ("BMI") was normal, his complaints regarding his extremities, and that he was seen by a neurosurgeon specialist where nothing more can be done.
>
> At a chronic clinic, the inmate is scheduled for a regular check-up where a limited examination is conducted for the type of conditions that the inmate is specifically

at the clinic for (i.e., respiratory, cardiovascular, gastrointestinal). Regarding issues associated with other conditions, the inmate should raises [sic] those complaints through sick-call where a full examination can be conducted.

Epperson indicates in the Amended Complaint that I did not allow him to talk at the chronic clinic. This claim is untrue. All inmates are permitted to voice their concerns during a consultation. However, if the inmate does not cease talking during my examination, his talking interferes with my ability to listen to his lungs and heart. The only time that I would ask an inmate to cease talking is when I cannot complete the examination due to the inability to listen to his body's functions.

Exhibit F (Doc. #87-6 at 2) (enumeration omitted).

Plaintiff was seen by Dr. Gonzalez on March 23, 2011, May 16, 2011, June 16, 2011, and June 24, 2011. Prior to being seen by Dr. Gonzalez, Plaintiff was seen by Dr. Gama, a neurology specialist on March 21, 2011. Exhibit E, Consultant's Report (Doc. #87-5 at 7). Dr. Gama recommended Baclofen for spasms and pain, referral to pain management, and Plaintiff's return to the clinic as needed. Id. Dr. Gonzalez adopted the specialist's recommendation for Baclofen, and prescribed a regimen of the narcotic on March 23, 2011. Exhibit B (Doc. #87-2 at 37). He also prescribed Tylenol #3 for pain management. Id. On April 8, 2011, Plaintiff declined to continue taking the Baclofen after he became nauseous. Id. at 40. Dr. Gonzalez discontinued the Baclofen after Plaintiff refused to take it. Id. On April 27, 2011, Dr. Gonzalez prescribed Motrin, noting

- 36 -

that Plaintiff had refused the Baclofen. <u>Id</u>. at 41.  Due to an
allergy to Motrin, Plaintiff was provided with a supply of Tylenol.
<u>Id</u>. at 42.

On June 16, 2011, Plaintiff accessed sick call requesting
renewal of passes for an extra pillow, an extra blanket and a straw
hat.  <u>Id</u>. at 43.  Dr. Gonzalez denied the request for renewal of
some passes.  <u>Id</u>.  He did, however, approve passes for a low bunk
and a straw hat on June 24, 2011.  <u>Id</u>. at 45-46.  Also, on June 24,
2011, Plaintiff was seen in the Chronic Clinic for respiratory,
cardiovascular and gastrointestinal conditions.  <u>Id</u>. at 44.
Plaintiff complained of pain.  <u>Id</u>.  Vital signs were taken,
medications were noted, and blood tests were ordered.  <u>Id</u>.  Dr.
Gonzalez recommended Plaintiff continue previous treatments.  <u>Id</u>.
It was noted that Plaintiff refused the specialist's recommendation
that he take Baclofen.  <u>Id</u>.  Dr. Gonzalez discontinued the GI Clinic
and provided Plaintiff with chronic illness education.  <u>Id</u>.

Dr. Gonzalez, attests to the following:

> Epperson was first referred to me after he
> had a consultation on March 21, 2011, with Dr.
> Gama, a neurologist.  Dr. Gama recommended
> Baclofen for Epperson's spasms and pain,
> referral to pain management, and to return to
> the clinic as needed.
>
> As Epperson's physician at Columbia C.I.
> Annex, on March 23, 2011, I adopted the
> recommendation for Baclofen, a narcotic drug,
> and decided to prescribe Tylenol #3, another
> narcotic drug which contains Codeine, after the
> Baclofen regimen was completed.  I prescribed
> Baclofen for a three week regimen.

- 37 -

Then, on April 8, 2011, before the regimen was complete, Epperson indicated through sick-call that he wanted to refuse the Baclofen prescription due to complaints of nausea. To replace the Baclofen, on May 16, 2011, I ordered Motrin, which was an appropriate substitute for pain but which appeared thereafter that Epperson was allergic to. I did not prescribe Motrin to purposefully injure Epperson or retaliated [sic] against him. I merely was attempting to address his need at that time with a substitute for Baclofen. Still, on May 27, 2011, Epperson sought a sick-call consultation where Tylenol was provided to him.

Epperson was next referred to me on June 16, 2011, for pass renewals for a straw hat, an extra blanket, and an extra pillow. At that time, I denied the requested passes because there was no skin condition indicated for the straw hat, and medical did not prescribe an extra pillow or blanket unless there was a condition specified for such a need. At that time, there was no indicated condition to justify issuing the requested passes.

Lastly, Epperson was referred to me on June 24, 2011. I had a consultation with him at the chronic clinic for respiratory, cardiovascular, and gastrointestinal issues. Epperson had regular check-ups at the chronic clinic for his asthma, COPD which is related to his cigarette smoking, pacemaker, and Hepititis [sic]. At that time, I did not note any complaints regarding pain/spasms. However, I did note that he refused Baclofen as recommended by the neurologist, Dr. Gama, ordered a blood test panel, and instructed him on disease process, medication compliance/instructions, side effects, diet/exercise, treatment compliance, and smoking cessation. The blood panel test came back normal, so I decided to discontinue the gastrointestinal aspect of the clinic. I also approved the renewal of a low bunk pass and straw hat for Epperson.

- 38 -

Exhibit H (Doc. #87-8 at 1-2) (enumeration omitted).

Plaintiff alleges that Dr. Gaxiola, in January 2011, denied Plaintiff's diet pass or directed the denial of Plaintiff's diet pass. Upon review of the medical records, however, Dr. Gurney considered Plaintiff's BMI of 24 and Plaintiff's laboratory tests, and determined there was "no indication for special diet found in records." Exhibit B (Doc. #87-2 at 33). Dr. Gurney, not a named Defendant in this action, denied Plaintiff's diet pass on January 11, 2011.

Plaintiff also alleges that Dr. Gaxiola directed Dr. Gonzalez to prescribe Motrin in May 2011. The medical records do not support this contention. Dr. Gonzalez prescribed Motrin. Dr. Gaxiola attests, in the Declaration of Dora Gaxiola, to the following: "[s]pecifically, Epperson alleges that as retaliation, I denied him a diet pass in January 2011, and that I directed Dr. Gonzalez to prescribe him Motrin in May 2011. These allegations are completely untrue. Further, in January, I was not working at Columbia C.I." Exhibit I (Doc. #87-9 at 1) (enumeration omitted).

The Court has thoroughly reviewed the medical records and the declarations of the parties and concludes that there was no deliberate indifference to Plaintiff's medical needs by Defendants Smith, Isra, Gonzalez and Gaxiola. Plaintiff was seen by medical professionals on a regular basis and was not been deprived of adequate medical care. Apparently in an attempt to avoid medical

co-pay charges for sick call visits, Plaintiff sought routine medical care during emergency room consultations. Dr. Smith, on July 12, 2010, did not find any emergent condition, but she also did not ignore Plaintiff's complaints. In fact, she prescribed nitroglycerin as needed. Plaintiff was examined in the emergency room on September 16, 2010, and was found to have an abnormal EKG. Dr. Smith ordered blood work and determined that Plaintiff had not suffered a heart attack. Again, although Plaintiff did not present an emergent condition, she prescribed daily aspirin and rescheduled his pacemaker clinic.[10]

While Plaintiff disagrees with the treatment he received from Dr. Isra, Plaintiff has failed to provide any medical evidence to support his claim that she was deliberately indifferent to his serious medical needs. Plaintiff received medical attention from Dr. Isra during his chronic clinic visit for respiratory, cardiovascular and gastrointestinal conditions. She reviewed medical records, considered lab results, considered his vital signs

---

[10] Although Plaintiff alleges that Dr. Smith told Nurse Summerall to get Plaintiff out of the wheelchair, and Dr. Smith denies ordering Plaintiff be removed from the wheelchair, this disputed issue of fact will not prevent the Court from granting summary judgment as the disputed fact is not material. Plaintiff was not subjected to cruel and unusual punishment by Defendant Smith. Plaintiff claims he told the nurse that he could not walk all the way to the dorm, and the nurse, not the doctor, responded that this was Plaintiff's problem. When Plaintiff struggled in walking to the dormitory, a sergeant ordered Plaintiff to be transported in a wheelchair. Thus, Plaintiff was not required to walk to his dormitory unaided.

and normal BMI, and noted that the neurosurgeon determined that there was not much that could be done with the symptoms in his extremities.  She recorded his multiple medical problems, renewed his medications, and scheduled a follow-up visit.

Although Plaintiff contends that Dr. Isra would not allow him to talk, this assertion is belied by the record.  Plaintiff presented a litany of complaints, which were recorded, and objective measures were undertaken and assessments made by Dr. Isra.  Dr. Isra explains that at some point in the examination she would ask the patient to cease talking so that a proper examination may be undertaken, including listening to the patient's lungs and heart. The directive to stop talking during a medical examination does not amount to an Eighth Amendment violation.   In this particular instance, Plaintiff was examined and his medications were renewed. Plaintiff has not demonstrated that this response to his medical needs was poor enough to constitute an unnecessary and wanton infliction of pain.

With respect to the allegations against Dr. Gonzalez, upon review, Dr. Gonzalez adopted the recommendations of the specialist by prescribing Baclofen and pain medication.  Although Plaintiff turned out to be allergic to Motrin and reacted badly to Baclofen, Dr. Gonzalez's actions do not constitute deliberate indifference. Dr. Gonzalez prescribed medication to help relieve Plaintiff's pain and spasms.  Apparently it was documented that Plaintiff was

allergic to Ibuprofen, but Dr. Gonzalez's action of prescribing Motrin, at most, would amount to negligence or medical malpractice. Dr. Gonzalez was attempting to follow the specialist's advice while offering a comparable substitute for Baclofen, which Plaintiff refused to take due to nausea.[11]   Moreover, Plaintiff does not assert that he was allergic to Baclofen or that Dr. Gonzalez was aware that Plaintiff could not tolerate Baclofen when he prescribed it.  Plaintiff simply became nauseous when he took Baclofen, and he declined to take any further doses.

Also, the fact that Dr. Gonzalez denied Plaintiff's request for an extra pillow and an extra blanket does not amount to cruel and unusual punishment.  The Court also notes that this decision was made in the summer, not during the cold, winter months.  These items may have given Plaintiff some extra comfort, but the lack of these items did not subject Plaintiff to wanton pain and discomfort. Finally, Dr. Gonzalez's decision to discontinue the gastrointestinal aspect of the chronic clinic was based on Plaintiff's blood panel coming back as normal.

Defendant Gaxiola has met his initial burden, but Plaintiff has failed to present documentation to show that there is a genuine issue for trial.  Dr. Gaxiola has shown that Dr. Gurney denied Plaintiff's diet pass in January 2011.  Plaintiff's contention that

---

[11] Plaintiff was provided with Tylenol for pain relief after reporting to medical personnel that he was allergic to Motrin.

Dr. Gaxiola directed Dr. Gonzalez to prescribe Motrin is entirely unsupported. Dr. Gonzalez prescribed Motrin as an alternative to Baclofen, which Plaintiff declined to take as it made him nauseous.

With respect to Defendants Davis and Willis, Plaintiff has asserted that they were deliberately indifferent to his serious medical needs, however, these allegations will be addressed under the portion of the opinion addressing Plaintiff's Eighth Amendment claim with regard to the denial of, or lack of responses to, grievances. Plaintiff has also claimed that Defendant Davis created or enforced a policy that is deliberately indifferent to serious medical needs. Apparently, Plaintiff is contending that Defendant Davis had a policy that limited Plaintiff's access to physicians. This assertion is certainly belied by the record before the Court. Plaintiff was referred to and seen by a physician when he arrived at an institution; he was transferred to see specialists, including a cardiologist, an orthopedic surgeon, and a neurologist; he was seen by physicians in the Emergency Room and in chronic clinics; he was seen by doctors for re-evaluations of medical passes; and he was placed on frequent medical call-outs. Plaintiff received extensive medical care and treatment while he was confined in the FDOC. Plaintiff has not presented evidence that Defendants Davis and Willis deprived him of access to medical care.

As a matter of law, none of the actions of these Defendants would constitute deliberate indifference to a serious medical need.

Plaintiff received prompt, frequent, and thorough medical attention. Indeed, the medical attention he received was rather exhaustive under the circumstances.  The Court recognizes that Plaintiff has a multitude of medical needs, and he was in extensive pain and discomfort over the years.  This, however, was not due to the deliberate indifference of the Defendants, but rather was due to his medical condition.  The fact that Plaintiff was dissatisfied with the type of treatment he received does not mean he was subjected to cruel and unusual punishment.  At most he has shown a disagreement with the course of treatment; however, he has failed to support his contention that he was provided with wanton and constitutionally deficient medical care.

Assuming Plaintiff has, at most, supported a claim of negligence or medical malpractice, such a claim does not amount to a constitutional violation under the Eighth Amendment of the United States Constitution.  Indeed, "[a]ccidents, mistakes, negligence, and medical malpractice are not 'constitutional violation[s] merely because the victim is a prisoner.'"  Harris v. Coweta County, 21 F.3d 388, 393 (11th Cir. 1994) (citing Estelle v. Gamble, 429 U.S. 97, 106 (1976)); Rooney v. Watson, 101 F.3d 1378, 1380-81 (11th Cir. 1996) (stating that the alleged negligence does not transform a state tort claim into a constitutional deprivation), cert. denied, 522 U.S. 966 (1997); Cannon v. Taylor, 782 F.2d 947, 949-50 (11th Cir. 1986).  Plaintiff must demonstrate that the Defendants'

responses to his medical needs were poor enough to constitute an unnecessary and wanton infliction of pain, and not merely accidental inadequacy, negligence in treatment, or even medical malpractice actionable under state law.  Taylor v. Adams, 221 F.3d at 1258 (citing Estelle v. Gamble, 429 U.S. at 105-06), cert. denied, 531 U.S. 1077 (2001).  Plaintiff has failed to make such a demonstration, and the Defendants' Corrected Motion for Summary Judgment is due to be granted.

### E.  Eighth Amendment Claim Concerning Grievances

Plaintiff complains that he was subjected to cruel and unusual punishment by the Defendants [Smith, Isra, Gonzalez, Gaxiola, Willis, Davis, and the Secretary of the FDOC] through their denial of or failure to respond to medical grievances.  Even assuming the Defendants directed that the grievances be denied, that action is insufficient to impose liability.  See Larson v. Meek, 240 Fed.Appx. 777, 780 (10th Cir. 2007) (not selected for publication in the Federal Reporter) (finding that a defendant's "denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations"); Baker v. Rexroad, 159 Fed.Appx. 61, 62 (11th Cir. 2005) (per curiam) (not selected for publication in the Federal Reporter) ("Because the failure of [the defendant] to take corrective action upon the filing of [the plaintiff]'s administrative appeal at the institutional level did not amount to a violation of due process, the district court

properly determined that [the plaintiff] failed to state a claim under § 1983"), <u>cert</u>. <u>denied</u>, 549 U.S. 840 (2006); <u>Shehee v. Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999) (finding that prison officials who were not involved in an inmate's termination from his commissary job, and whose only roles involved the denial of administrative grievances or the failure to act, were not liable under § 1983 on a theory that the failure to act constituted an acquiescence in the unconstitutional conduct), <u>cert</u>. <u>denied</u>, 530 U.S. 1264 (2000).

## F.  First Amendment Retaliation Claim

In Claim 3, Plaintiff presents his First Amendment claim that Defendants Smith, Ledesma, Delgado, Isra, Davis, Willis, Gaxiola, and Gonzalez have retaliated against Plaintiff for utilizing the grievance process.  Defendants assert that Plaintiff has failed to show that any adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in conduct or speech protected under the First Amendment, and that he has failed to show a causal connection existed between the protected conduct and any adverse action taken by the Defendants.  Corrected Motion for Summary Judgment at 18.  <u>See</u> <u>Bennett v. Hendrix</u>, 423 F.3d 1247, 1250, 1254 (11th Cir. 2005), <u>cert</u>. <u>denied</u>, 549 U.S. 809 (2006).

This Circuit has said that First Amendment rights to free speech and to petition the government for a redress of grievances

are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment.  Moulds v. Bullard, 345 Fed.Appx. 387, 393 (11th Cir. 2009) (per curiam) (not selected for publication in the Federal Reporter) (quotations and citation omitted).  With respect to a retaliation claim, an inmate must establish three elements in order to prevail on his First Amendment claim.

> "The inmate must prove that: (1) "his speech or act was constitutionally protected"; (2) "the defendant's retaliatory conduct adversely affected the protected speech"; and (3) "there is a causal connection between the retaliatory actions and the adverse effect on speech." Id. To establish causation, the plaintiff must show that the defendant was "subjectively motivated to discipline" the plaintiff for exercising his First Amendment rights. Smith v. Mosley, 532 F.3d 1270, 1278 (11th Cir. 2008). "[O]nce the plaintiff ... establish[es] that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he ... prevail[s] on ... summary judgment." Id. (quotation marks omitted).

Moton v. Cowart, 631 F.3d 1337, 1341-42 (11th Cir. 2011).

Assuming *arguendo*, Plaintiff established the first two prongs, he has not created an issue of fact to support the third prong, which requires a showing of a causal connection between the Plaintiff's protected speech and the Defendants' actions.  Jemison v. Wise, 386 Fed.Appx. 961, 964-65 (11th Cir. 2010) (per curiam) (not selected for publication in the Federal Reporter) (citation

omitted).   To establish this third prong, a plaintiff is required
to do more than make "general attacks" upon a defendant's
motivations and must articulate "affirmative evidence" of
retaliation to prove the requisite motive. Crawford-el v. Britton,
523 U.S. 574, 600 (1998) (citations omitted).   "In other words, the
prisoner must show that, as a subjective matter, a motivation for
the defendant's adverse action was the prisoner's grievance or
lawsuit." Jemison, 386 Fed.Appx. at 965 (citation omitted).

Plaintiff was certainly not deterred from filing grievances,
as exhibited by the extensive record of grievances submitted by him
through the institutional administrative grievance process.
Plaintiff freely exercised his First Amendment rights by filing
numerous complaints about the medical care he received while
confined in the FDOC. See Exhibit N, Declaration of Ashley Stokes
(Doc. #87-14).   Defendants have met their burden of showing that
Plaintiff's grievances were denied based on sound medical judgment,
and not due to any retaliatory motive. See Dr. Ledesma's Affidavit
(Doc. #90);[12] Dr. Delgado's Affidavit (Doc. #83-2 at 2); Exhibit C,
Declaration of Page Smith (Doc. #87-3 at 3-4); Exhibit F,
Declaration of Paiboon Isra (Doc. #87-6 at 2-3); Exhibit H,
Declaration of Miguel Gonzalez (Doc. #87-8 at 1-2); Exhibit I,

---

[12] Defendant Ledesma attests that her decision to discontinue
Plaintiff's wheelchair pass was done without considering any
grievances filed against her.  Affidavit of Francisca Ledesma, M.D.
(Doc. #90).  Other than conclusory allegations, Plaintiff has not
shown otherwise.

Declaration of Dora Gaxiola (Doc. #87-9 at 1-2); Exhibit K, Declaration of Michael Willis (Doc. #87-11 at 1-2); and Exhibit L, Declaration of Donald Davis (Doc. #87-12 at 1-2).[13]

In response, Plaintiff has not articulated affirmative evidence of retaliation. Plaintiff simply surmises that his grievances were denied in retaliation for his filings complaints and grievances. Plaintiff has failed to provide documentary evidence that demonstrates that, as a subjective matter, a motivation for the Defendants' decision-making in denying or failing to address grievances was based on Plaintiff's history or pattern of filing medical grievances and complaints. Plaintiff has not presented a genuine issue for trial; therefore, summary judgment will be entered in favor of the Defendants.

## G. Qualified Immunity

Defendants [Ledesma, Smith, Isra, Gonzalez, Gaxiola, Willis, and Davis] contend that they are entitled to qualified immunity. The Eleventh Circuit has said:

> To receive qualified immunity, [a] public official must establish that he was engaged in a "discretionary function" at the time he committed the allegedly unlawful act. Holloman ex. rel. Holloman v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004) . . . . If the official demonstrates that he was engaged in a discretionary function, the burden shifts to

---

[13] Of note, Michael Willis and Donald Davis are not medical professionals and are not qualified to make medical judgments and decisions. They defer to the judgment of the medical professionals when responding to medical grievances.

> the plaintiff to prove that the official is not entitled to qualified immunity. <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1358 (11th Cir. 2003). This requires plaintiff to satisfy the two-part test prescribed by the Supreme Court in <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Under <u>Saucier</u>, a plaintiff must first show that the defendant violated a constitutional right and then demonstrate that the constitutional right was clearly established at the time of the alleged wrongful act. 533 U.S. at 201, 121 S.Ct. at 2156. If a court, after viewing all the evidence in the light most favorable to the plaintiff and drawing all inferences in his favor, determines that the plaintiff has satisfied these two requirements, the defendant may not obtain qualified immunity. <u>Holloman</u>, 370 F.3d at 1264.

<u>Bryant v. Jones</u>, 575 F.3d 1281, 1295 (11th Cir. 2009), <u>cert</u>. <u>denied</u>, 130 S.Ct. 1536 (2010). Following the United States Supreme Court's decision in <u>Pearson v. Callahan</u>, 555 U.S. 223, 236 (2009), this Court is "free to consider these elements in either sequence and to decide the case on the basis of either element that is not demonstrated." <u>Youmans v. Gagnon</u>, 626 F.3d 557, 562 (11th Cir. 2010) (per curiam).

It is undisputed that the Defendants were engaged in discretionary functions during the events in question. These Defendants did not violate Plaintiff's constitutional rights and are therefore entitled to qualified immunity.

### H.   Injunctive Relief

Plaintiff is no longer confined in the FDOC; therefore, as the Court cannot effectuate any relief regarding the Defendants' medical

treatment of Plaintiff, his claims for injunctive relief are due to be dismissed as moot.

## I.   Equal Protection and Due Process

To the extent Plaintiff is attempting to raise equal protection or due process claims, his allegations are too vague and conclusory to support such claims.[14]   Therefore, any claim of denial of equal protection of the law or any claim of denial of due process of law are due to be dismissed.

## V. Summary Judgment

Based on all of the above, the Defendants are entitled to summary judgment or dismissal from the action, and judgment shall be entered for the Defendants and against the Plaintiff.

Therefore, it is now

**ORDERED:**

---

[14] Plaintiff alleges that other inmates received different medical treatment and narcotic pain medication from some of the Defendants.  He has failed to show that these unnamed inmates had the same or similar medical complaints, injuries, physical constitution and medical condition, and he has not shown that there was no rational basis for the dissimilar treatment given to those other prisoners similarly situated.  Significantly, Plaintiff was prescribed Baclofen, see Exhibit H (Doc. #87-8 at 2), a narcotic drug that he requested to relieve his pain and spasms, however, the medication upset his stomach, so he declined any further doses.

1.     **Defendant Edwin G. Buss**, who remained in the case only in his official capacity, is **DISMISSED WITH PREJUDICE.**

2.     **Secretary Michael D. Crews** is automatically substituted for the official capacity claims for **former Secretary Kenneth Tucker.**

3.     **Defendant Jane Doe, LPN**, a fictitious party, is hereby **DISMISSED** from this action **with prejudice.**

4.     **Defendant D. Hall, LPN**, is **DISMISSED WITH PREJUDICE**, as the claims against her are frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B).

5.     Defendant, Jorge Delgado, MD's Motion for Summary Judgment (Doc. #83) is **GRANTED**, and the **Clerk** shall enter judgment for Defendant Delgado and against Plaintiff Epperson.

6.     Defendant's, Dr. Francisca Ledesma's Motion for Summary Judgment (Doc. #85) is **GRANTED**, and the **Clerk** shall enter judgment for Defendant Ledesma and against Plaintiff Epperson.

7.     The Corrected Motion for Summary Judgment by Defendants Smith, Isra, Gonzalez, Gaxiola, Willis, Davis, and [Crews] (Doc. #92) is **GRANTED**, and the **Clerk** shall enter judgment for Defendants Smith, Isra, Gonzalez, Gaxiola, Willis, Davis, and Crews and against Plaintiff Epperson.

8.     Any claims for injunctive relief are **DISMISSED AS MOOT.**

9.    The **Clerk** shall enter judgment accordingly and close this case.

**DONE AND ORDERED** at Jacksonville, Florida, this 11<u>th</u> day of January, 2013.

ROY B. DALTON, JR.
United States District Judge

sa 1/9
c:
Rodney C. Epperson
Counsel of Record

- 53 -